## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

CHRISTINE LEARING, individually
and on behalf of all others similarly
situated,

                Plaintiff,

v.

THE ANTHEM COMPANIES, INC.,
Amerigroup Corporation, and
Amerigroup Partnership Plan, LLC,

                Defendants.

Case No.0:21-CV-02283-JWB-DJF

**PLAINTIFF'S MEMORANDUM IN
SUPPORT OF MOTION FOR RULE
23 CERTIFICATION**

## <u>INTRODUCTION</u>

Congress designed the Fair Labor Standards Act ("FLSA") to provide the minimum protection to American workers with respect to overtime and minimum wage compensation. 29 U.S.C. § 218(a). The Act specifically states that it does not preclude, and thereby encourages, states to enact their own laws that provide additional or greater advantages to their workers. *Id.* Minnesota is such a state. In Minnesota, workers who—for any number of reasons—choose not to participate in a Fair Labor Standards Act collective action lawsuit by affirmatively filing a consent form with the Court can still benefit from the efforts of their coworkers who have stepped forward and are actively prosecuting their claims through the Rule 23 class action mechanism.

Defendants The Anthem Companies, Inc., Amerigroup Corporation, and Amerigroup Partnership Plan, LLC (hereinafter collectively "Anthem" or "Defendants")

1

employed a class of approximately 65 Nurse Medical Management ("NMM") reviewers in Minnesota during the relevant statutory period, including Named Plaintiff and proposed Class Representative Christine Learing. With this motion, Plaintiff Learing requests that the Court certify a class of Anthem's NMMs who worked in the State of Minnesota between October 14, 2018, to the present. Plaintiff further requests that the Court appoint her Counsel, Nichols Kaster, PLLP as Class Counsel and Plaintiff Learing as Class Representative.

Plaintiff satisfies each requirement of Rule 23. Indeed, a class action makes perfect sense in a case like this where the putative class members all worked in the same position in the same state, performing the same utilization review job, under the same compensation plan, subject to the same processes and policies, were all classified as exempt for the same reason pursuant to the same statute, are subject to the same exemption defenses, and all seek the same recovery: unpaid overtime wages. For these reasons and those stated further below, Plaintiff respectfully requests that the Court grant this motion.

## **PROCEDURAL HISTORY**

Plaintiff Christine Learing worked as a utilization review nurse for Anthem in Minnesota during the proposed class period. (Ex. 1, Plaintiff Learing's Am. Answers to Defs.' Interrog., Resp. No. 1.) Her official job title was "Nurse Medical Management." (*Id.*) On October 14, 2021, Plaintiff Learing filed this class and collective action lawsuit against The Anthem Companies, Inc. on behalf of herself and all other similarly situated utilization review nurses, alleging violations of the FLSA, Minnesota Fair Labor Standards Act ("MFLSA"), and Minnesota Wage Payment Act ("MWPA"). (ECF No. 1.)

Specifically, Plaintiff alleges that Defendants misclassified her and all other utilization review nurses in Minnesota as exempt and, as a result, they are entitled to overtime pay for all weeks in which they worked more than 48 hours. (*Id.*; ECF No. 90.) Plaintiff later amended her Complaint to include Defendants Amerigroup Corporation and Amerigroup Partnership Plan, LLC. (ECF No. 90.) Anthem claims that it properly classified all NMMs as professionally and administratively exempt employees and made its classification decision in good faith. (*See* ECF No. 97, Answer to Sec. Am. Compl.)

On February 28, 2022, the Court conditionally certified an FLSA collective and authorized notice to issue. (ECF No. 49.) The list included approximately sixty-five (65) NMMs whom Defendants employed from August 8, 2018, to March 31, 2022, when the list was provided to Plaintiff's Counsel. (Srey Decl. ¶ 4.) The FLSA notice period closed on May 21, 2022. (*Id.* ¶ 5.) Besides Learing, 23 other former and current utilization reviewers joined the FLSA collective as "Opt-in" Plaintiffs.[1]

Since the FLSA notice period, the parties have served and exchanged written discovery and taken several depositions. Defendants initially sought written and deposition discovery from all Plaintiffs. Plaintiff opposed this request. (*See* ECF No. 72.) Ultimately, this Court agreed with Plaintiff and limited discovery to eight opt-in Plaintiffs for written and deposition discovery. (ECF No. 75.) The parties met and conferred regarding the

---

[1] While twenty-three individuals filed consent to join forms, only 18 are currently participating in the collective. Two Opt-in Plaintiffs, Jennifer Brandt and Julie Kilber, did not work for Defendants within the relevant statutory period. The following three have not participated in the litigation: Amanda Mangowi, Kelly Notch, and Carrie Schmitt. (*Id.* ¶ 6.)

method for selecting the eight representative plaintiffs and ultimately agreed to randomly select the eight Opt-in Plaintiffs, controlling for certain agreed-upon factors (i.e., job titles, department, and dates of employment). The parties also agreed that each party could select two additional Opt-in Plaintiffs to add to the representative pool.[2] (Srey Decl. ¶ 7.) Pursuant to this agreement, Defendants deposed Plaintiff Learing and ten Opt-in Plaintiffs. Plaintiff deposed Defendants' two corporate designees and a manager. (*Id.*) All Plaintiffs responded to Defendants' written requests. (*Id.*; Ex. 1; Ex. 2, Opt-in Pls.' Interrog. Resps.)

## RELEVANT FACTS

### A.    The Parties.

Plaintiff, the FLSA collective, and the Rule 23 putative class members are or were employed by Defendants as utilization reviewers during the relevant statutory period. (Ex. 1 at Resp. No. 1; Ex. 2 at Resp. No. 1.) Their official job title was Nurse Medical Management I, Nurse Medical Management II, Nurse Medical Management Senior, and/or Nurse Medical Management Lead (collectively, "NMMs"). (Ex. 3, Defs.' Interrog. Resps., at No. 2.) Plaintiff Learing worked for Defendants as an NMM II from September 2018 to May 2019 and as an NMM I from approximately October 2019 to June 2021. (Ex. 1 at Resp. No. 1.) Plaintiff and putative class members all work or worked in the same utilization management sector of the clinical solutions team in Defendants' Government Business Division. (*See* Ex. 35, "Bickford Dep." at 4:24-5:22, 26:7-22; *see also id.* at 25:9-

_____

[2] Defendants selected two additional Plaintiffs. Plaintiffs added none. (*Id.*)

18, 91:16-92:10, 93:18-22, 94:6-16 (referring to utilization management, "UM operations," "clinical operations," and "healthcare management" interchangeably).)

Defendants are subsidiaries of Anthem, Inc.[3] (Bickford Dep. at 9:7-21, 103:16-19; Ex. 4, Defs.' Resp. to Pl's. Req. for Admission ¶¶ 23, 24.) Anthem is a multi-line health insurance company providing managed care programs and related services. (ECF No. 97, "Answer to Sec. Am. Compl." ¶ 14.) The Anthem Companies, Inc. provides back-office support to other Anthem subsidiaries in areas like payroll and human resources. (Answer to Sec. Am. Compl. ¶ 25.) Anthem acquired Amerigroup Corporation, a managed care organization, in approximately 2012 to primarily handle Anthem's Medicaid business.[4] (Ex. 36, "Stokes Dep." at 11:6-14; Bickford Dep. at 14:22-15:12.) In Minnesota, the Medicaid contract is between another managed care organization, Blue Cross Blue Shield ("BCBS"), and Minnesota's Department of Human Services. (Bickford Dep. at 11:13-12:13.) BCBS subcontracted with Amerigroup Partnership Plan, LLC to provide certain managed care services, including utilization review services, for its Medicaid plans around October 2018. (Ex. 5, 2019 Utilization Management Program Description, at 009659; Bickford Dep. at 11:13-12:5, 12:20-13:1, 14:19-21, 16:19-17:6; Stokes Dep. at 15:4-25., 38:17-39:1.)

_____

[3] Anthem, Inc. has since rebranded itself as Elevance Health. (Answer to Sec. Am. Compl. ¶ 14.)
[4] Press Release, https://www.sec.gov/Archives/edgar/data/1064863/000119312512296755/d379084dex99 1.htm (last visited Apr. 21, 2023) (announcing WellPoint's (Anthem's predecessor) acquisition of Amerigroup on July 9, 2012).

**B.      Plaintiff and the Putative Class Share the Same Primary Job Duty.**

All NMMs' primary job duty is to perform utilization reviews, also called medical necessity reviews, of authorization requests submitted by healthcare providers against pre-determined guidelines and criteria for insurance coverage and payment purposes. (Ex. 4 at No. 9; Stokes Dep. at 104:13-22, 110:11-111:22 (agreeing that utilization reviewers for Medicaid across the enterprise are performing the same primary duty).) Anthem has standardized enterprise-wide job descriptions for each level of NMM position. (Ex. 6, NMM I, II, Lead Job Descriptions.)

Anthem expects all NMMs to follow a specific process for processing authorization requests regardless of the type of review. (Stokes Dep. at 20:17-21, 29:13-20; Ex. 37, "Head Dep." at 42:23-51:7 (detailing the step-by-step process for outpatient reviews). The utilization review process begins in the same way with a provider submitting a request for authorization. (Stokes Dep. at 20:22-21:6.) All NMMs conduct medical necessity reviews by reading information submitted by healthcare providers and reviewing it against objective medical necessity criteria. (Ex. 7, GBD Policies and Procedures: Clinical Criteria for Utilization Management Decisions, at 010014 (policy document defining appropriate application of objective clinical criteria based on medical evidence to determine medical necessity of requested services).) The utilization review involves comparing, or matching, submitted documentation with applicable criteria. (Stokes Dep. at 42:4-6 (testifying that NMMs receive training on MCG criteria and comparing it against the clinical); Head Dep. at 49:8-18 (testifying that a review for medical necessity consists of using the clinical information and comparing it to applicable criteria); *see also* Ex. 38, "Learing Dep." at

6

159:17-20 (stating it was "just matching up criteria with the information the provider sent in," "very mundane . . . productivity work"); Ex. 39, "Havir Dep." at 22:4-12 ("It's essentially taking data that you are given and comparing it to a criteria . . . you're playing kind of a matching game, if you will.").)

All NMMs can approve a requested benefit or service if the applicable criteria are met. (Ex. 8, Approval Initial Inpatient Review, at 008766; Ex. 9, Quick Reference Guide – Pend to Medical Director, at 008601.) NMMs cannot deviate from the criteria. (Ex. 40, "Friedrich Dep." at 107:18-21, 108:7-8; Ex. 41, "Botz Dep." at 109:1-8, 109:20-25.) No NMMs can deny authorization requests or make recommendations for denials. (Stokes Dep. at 121:12-15; Head Dep. at 77:2-7, 82:14-17.) Only a Medical Director, who is a licensed physician, can issue a denial. (Stokes Dep. at 121:16-20; *see* Ex. 7 at 010014 (noting "appropriate practitioner," which includes a Medical Director or physician, must issue denial).) If it is unclear whether the factual information submitted by the provider satisfies the applicable criteria or if it does not meet the criteria, the common utilization review process requires all NMMs to send (also known as "pend") the review to a Medical Director for their review and determination. (Ex. 9 at 008601; Ex. 8 at 008766.) Once the Medical Director makes a determination, NMMs must follow the next step in the process which is to communicate the Medical Director's decision to the requesting provider and member. (Head Dep. 50:24-51:7; Learing Dep. at 181:7-182:11; Ex. 10, Denial Process Step by Step, at 007503.)

Plaintiff and the putative class are not practicing professional nursing. *See* Minn. Stat. § 148.171, subd. 15 (defining the practice as the performance of patient care

7

services). They uniformly have no responsibility for patient care, do not treat or provide medical advice to members, or otherwise act in a nursing capacity. (*See* Stokes Dep. at 156:10-21 (admitting that reviewers do not direct care or provide hands-on care or treat patients).) NMMs commonly have little to no interaction with members. (Stokes Dep. at 118:10-12; Ex. 42, "Reichert Dep." at 147:23-148:2; *see* Learing Dep. at 261:8-14.)

## C.    NMMs' Work Uniformly Involves No Significant Discretion or Independent Judgment

Utilization review nurses in Minnesota are subject to the same contract between the state and BCBS and BCBS and Amerigroup, and the same utilization management process as described in the state-wide utilization management program description. (Minn. Dep't of Human Servs. Contract for Medicaid and MinnesotaCare Servs. § 6.15.3 "Utilization Review," https://mn.gov/dhs/assets/2023-fc-contract-bp_tcm1053-552965.pdf (last visited Apr. 24, 2023); Ex. 5.) Other common standards, policies, and procedures govern their utilization review work, including policies on consistent and accurate application of standardized criteria and guidelines, who may conduct utilization management reviews, standardized corporate and plan-level training for NMMs, obtaining additional information and appropriately documenting reviews, and strict requirements mandating the timeliness of their reviews. Indeed, uniform standards set by the National Committee for Quality Assurance ("NCQA"), a national accrediting organization, cover the structure of a utilization management program, clinical criteria, qualifications of review professionals, timeliness of decisions, and documentation and communication of review decisions, among other areas. (Ex. 11, NCQA Utilization Management 2020 Standards and

Guidelines, at 004045-4167.) These uniform standards also require managed care organizations like Defendants to consistently and accurately use evidence-based criteria when performing medical necessity reviews. (*Id.* at 004055-004059; Bickford Dep. at 50:20-51:17 (testifying that Amerigroup Partnership Plan is "accountable for providing services in accordance with the accreditation standards").)

All class members are subject to the same hierarchy for criteria they may use for their reviews, including federal and state Medicaid guidelines, Minnesota Health Care Plan ("MHCP") Guidelines, Milliman Care Guidelines ("MCG"), BCBS Medical Policies, Amerigroup Medical Policies, Amerigroup Clinical UM Guidelines, or Amerigroup Clinical Appropriateness Guidelines. (*See* Ex. 12, MN Clinical Criteria Hierarchy, at 004041 (directing NMMs to follow a specific hierarchy of criteria); Stokes Dep. at 114:11-115:2 (testifying the sequence is the same for both inpatient and outpatient reviews and inpatient is MCG, number 6 on the list); Head Dep. at 30:11-32:11 (CPT code defines which guidelines apply, but policy regarding the sequence of criteria must be followed, and that BCBS's monthly prior authorization list dictates which outpatient reviews require prior authorization and the criteria to be used); *see also* Ex. 13, BCBS Prior Authorization List.)

NMMs' utilization review work is also dictated by corporate-wide and state-specific work processes. For example, Defendants commonly require all NMMs to follow a step-by-step process for utilization reviews. (Ex. 14, Case Review Step-by-Step); Head Dep. at 42:8-51:3 (detailing the step-by-step process for an outpatient review).) The step-by-step process is the same regardless of whether reviewers are performing outpatient or inpatient

reviews. (Stokes Dep. at 96:14-19) ("I would say overall, yes. I mean they may have a different button to – or a different queue or something of that nature, but yes. the process.")

All NMMs are required to document reviews in the same computer program using the same documentation standards. (Bickford Dep. at 66:12-14; Head Dep. 59:4-12; Stokes Dep. at 113:1-114:3.) Defendants provide all NMMs with standardized templates and explicit instructions on documenting reviews. (*See* Ex. 14 at 003045 (instructing NMMs to build their review note "under the appropriate template"); Ex. 16, Jan. 23, 2019 UM Team Meeting Notes, at 003040 (same for reviews sent to the Medical Director); Ex. 17, Case Examples Template (standardized template); Ex. 18, Dec. 3, 2020 PA Staff Meeting Notes, at 002154 (communicating changes to documentation policies from corporate).)

Finally, all class members are subject to NCQA standards and Defendants' contractual obligations regarding specific turnaround times ("TATs") for completing authorization reviews. (Ex. 11 at 004071 (UM 5: Timeliness of UM Decisions); Ex. 19, Minnesota Inpatient TAT Decision Tree (outlining NCQA and contractual TAT times); *see, e.g.*, Ex. 18 at 002151 (reminding NMMs of TAT requirements and citing contract between BCBS and DHS).[5]

---

[5] Plaintiffs and the putative class are not responsible for creating the standards, processes, policies, and criteria they use for reviews, only for following and applying them. (Bickford Dep. at 84:25-85:3; Stokes Dep. at 107:9-13.) They do not make any policy determinations or assist Defendants in running their business operations. (*See* Bickford Dep. at 82:4-84:13; Head Dep. 109:7-110:5.) By performing utilization reviews, NMMs provide the insurance services that Defendants have been contracted to provide. (Bickford Dep. at 83:1-3; Head Dep. 109:16-24.)

### D.   NMMs are Provided with Standardized Training and Performance Measures.

There are no courses in nursing school pertaining to utilization review. (Learing Dep. at 248:25-249:10; Botz Dep. at 111:6-11.) Therefore, Defendants provide all new hires with the same training necessary to perform utilization review work. (Stokes Dep. at 36:21-37:11.) In fact, in Minnesota, all NMMs trained for months from approximately August 2018 to January 1, 2019, the "go live" date of the BCBS contract. (Ex. 20, 2018 Hoff Performance Evaluation; Ex. 21, 2018 Marturano Performance Evaluation; Bickford Dep. at 17:18-18-1.)

During training, Defendants teach new NMMs about Medicare and Medicaid and they undergo substantially similar training modules, the majority of which are focused on the various computer systems and applications the reviewers need to know to do their jobs. (Stokes Dep. at 40:11-43:16; *e.g.*, Ex. 22, UM Clinician Nurse Module: Outpatient Nurse Process.) Defendants also train NMMs on criteria and how to process an authorization request. (Stokes Dep. at 43:23-44:23*; see, e.g.*, Botz Dep. at 112:3-19 (explaining they were given classroom training on how to perform reviews and then sat with an instructor and learned how to use the computer programs and the criteria).) All NMMs similarly practice their authorization skills by going through mock authorizations. (Stokes Dep. at 44:15-23.) All NMMs also participate in on-the-job training with the health plan regarding Minnesota-specific rules and regulations. (Stokes Dep. at 43:17-22, 45:5-13.)

Defendants similarly monitor and measure all NMMs' job performance. For example, Defendants subjected all Plaintiff and putative class members to monthly "PIE"

audits and plan-specific (state) audits. (Stokes Dep. at 77:20-80:12; Head Dep. at 73:8-75:19.) Audits measure whether reviewers are processing authorizations properly from start to finish, against NCQA standards. (Stokes Dep. at 19:20-20:15, 70:6-71.) All reviewers are evaluated on the same factors:

- Timeliness;

- Clinical Review With Documentation (including that accurate contact information was inputted, HIPAA was verified, documentation of clinical being received or requested as necessary, use of the appropriate guideline/hierarchy, and appropriate documentation to support the decision/MD referral); and

- Appropriate Case Completion.

(*See, e.g.*, Ex. 23, Jan. 2019 Learing Audit Summary; Ex. 24, June 2019 Marturano Audit Summary); Ex. 18 at 002152 (listing aggregated PIE scores and metrics of concern on a division level).)

All NMMs are tested on whether they accurately and consistently apply the well-established criteria to the facts provided by the healthcare providers through mandatory Inter-Rater Reliability ("IRR") tests. (Ex. 25, GBD Policies and Procedures – Inter-Rater Reliability (IRR) Assessments; Ex. 26, 2019 GBD Inter-Rater Reliability Report; Bickford Dep. at 52:11-53:10, 64:14-18; *see id.* at 56:23-57:3.) IRR is defined as the "degree of agreement between two or more Health Care Management (HCM) clinical staff when applying medical necessity criteria on a given service request." (Ex. 25 at 010087.) Anthem expects all reviewers to be on the same page. (*See* Ex. 27, UM Team Meeting Notes dated Mar. 25, 2020, at 004467) ("We can't have five different people reviewing the same case five different ways. We need everyone on the same page to be able to look at the same

information and come to the same appropriate determination based on what is presented in the case.").) Each review has a right and wrong answer as to whether the medical necessity criteria have been met. (Bickford Dep. at 65:4-6.) Indeed, the IRR assessment's primary goal is to eliminate barriers to consistency, including variances in review processes across the entire enterprise, variances in application of criteria and guidelines, and ambiguity in the phrasing of the criteria. (Ex. 26 at 010058-59.)

All NMMs' job performance is also measured on the same metrics, namely on their productivity, i.e., the number of cases they review per day, their TAT, and their error (also known as "auth chex") scores.[6] (*See, e.g.*, Ex. 28, 2019 Dalen Performance Evaluation at 009064; Ex. 29, 2020 Friedrich Performance Evaluation; Head Dep. at 66:14-67:2.) (Ex. 30, Assignments and Productivity Information (identifying 2021 productivity metric increased to a minimum of 16-20 authorizations per day); Stokes Dep. at 66:17-67:16 (explaining that the metric for inpatient team is 25 to 30 cases a day.)

### D.    A Prolonged Course of Specialized Academic Instruction is Not Required to Do Utilization Reviews.

NCQA uniform utilization management standards set the minimum standards for which professionals can review authorization requests and does not require RN licensure. (Ex. 11; Stokes Dep. at 79:18-81:19 (testifying about NCQA standards being the rubric

---

[6] Defendants commonly also monitored all NMMs' productivity through the WorkIQ program, which tracks time spent in "productive" computer applications, particular websites, and idle computer time when their mouse was not moving. (Ex. 32, Apr. 27, 2021 PA Staff Meeting Notes, at 002188-2189; Stokes Dep. at 92:20-93:2.) NMMs were expected to spend 85% or better of their workday on productive work time. (Stokes Dep. at 93:9-16.)

that the health plan's utilization management program is audited against).) Defendants' internal policy corresponds directly to NCQA's standards. (*See* Ex. 31, GBD Policies and Procedures – Associates Performing Utilization Reviews – Core Process.) Under these UM standards, utilization review work may commonly be performed by Licensed Practical Nurses ("LPNs") and Licensed Vocational Nurses ("LVNs"). (*Id.* at 010211 ("Medical disciplines that may have the qualifications, education, and/or experience to successfully perform utilization reviews as consistent with state and federal regulations and state contracts [include] Licensed Practical Nurse/Licensed Vocational Nurse (LPN/LVN).)[7]

Nonetheless, Defendants' common job descriptions required Plaintiff and putative class members to possess RN licenses. Defendants also require two years of "acute clinical care experience" for the NMM position, but it does not need to be from any particular type of setting or experience. Although the current job descriptions require an RN license, Defendants have historically hired LPNs and LVNs to perform utilization review work. (Stokes Dep. 148:7-18 (admitting that when she was a reviewer, she had LPNs on her team but that in 2010, Anthem pushed LPNs into a different role within the organization);*id.*, Ex. 33, Job Description for Amerigroup Utilization Manager.)[8] And since acquiring Amerigroup, Anthem and its subsidiaries have consistently continued to employ LPNs and

---

[7] The contract between Minnesota's Department of Human Services and BCBS also does not require medical necessity reviews to be performed by RNs. (*See* Minn. Dep't of Human Servs. Contract for Medicaid and MinnesotaCare Servs. § 6.15.3 "Utilization Review," https://mn.gov/dhs/assets/2023-fc-contract-bp_tcm1053-552965.pdf (last visited Apr. 22, 2023).)

[8] Stokes admitted that the duties and responsibilities of reviewers today are the same or similar as they were historically. (Stokes Dep. 150:3-151:11.)

LVNs all over the country to conduct utilization reviews as their primary job duty. (Ex. 4, at No. 17; Ex. 34, Licensed Utilization Reviewer Job Descriptions.)[9] Anthem's LPN and RN reviewers use the same criteria and guidelines to conduct reviews and are both authorized to independently approve requests if criteria are met. (Stokes Dep. at 111:23-112:13; 114:14-115:2, 125:2-5, 152:24-153:7; Head Dep. 83:11:19 (licensed utilization review nurses (LPNs) follow the same clinical criteria hierarchy when they are reviewing for the state of Minnesota); Bickford Dep. at 31:10-19, 33:11-16, 38:13-17; Ex. 4, at No. 19.)

> ### E.   Anthem Uniformly Classifies All Class Members as Exempt, Did Not Track Their Hours Worked, and Denied Them Overtime Pay.

Plaintiff and the putative class commonly work unpaid overtime hours. (*See* Ex. 1 at Resp. No. 3; Ex. 2 at Resp. No. 3.) Defendants pay NMMs a salary, commonly failed to track their hours worked, and classify them as professionally and administratively exempt from the overtime requirements of the FLSA and Minnesota law. (Answer to Sec. Am. Compl. ¶¶ 55–56; Bickford Dep. at 76:21-24, 85:12-14; Stokes Dep. at 147:4-8.)

## ARGUMENT

## I.   Legal Framework Underlying Plaintiff's Claims for Unpaid Wages.

Plaintiff seeks to certify the following Rule 23 class under Minnesota state law:

> All persons who worked as Medical Management Nurses, Utilization Management Nurses, Utilization Review Nurses, or other similar job titles who were paid a salary and treated as exempt from overtime laws, and were

---

[9] The parties agreed that a number of documents produced in a related matter, *Canaday v. The Anthem Companies, Inc.*, No. 1:19-cv-01084 (W.D. Tenn.) could be used by the parties here because they are enterprise documents, *i.e.*, applicable across Anthem entities. (Srey Decl. ¶ 9.)

primarily responsible for performing medical necessity reviews for Defendants in Minnesota from three years prior to the filing of this Complaint through judgment.

Plaintiff and the putative Minnesota Rule 23 class seek payment for unpaid overtime wages and penalties under the MFLSA and MWPA. (ECF No. 90, Sec. Am. Compl.) The MFLSA requires employers to pay non-exempt employees for hours worked in excess of 48 in a workweek at a rate of no less than one and one-half times their regular hourly rate of pay. *See* Minn. Stat. §§ 177.23 and 1777.24. Plaintiff's MFLSA claims are analogous to their FLSA claims and therefore their arguments regarding Defendants' FLSA exemption defenses apply equally to their MFLSA claims. *See Cruz v. Lawson Software, Inc.* 764 F. Supp. 2d 1050, 1070 (D. Minn. 2011) (addressing the MFLSA and FLSA's administrative exemptions); Minn. Rules 5200.0200 (administrative tests); 5200.0210 (professional tests).

The MPWA requires every employer to pay "all wages . . . earned by an employee at least once every 31 days." Minn. Stat. § 181.101. The MPWA permits for the recovery of "wages earned at the employee's rate or rates of pay or at the rate or rates required by law, including any applicable statute, regulation, rule, ordinance, government resolution or policy, contract, or other legal authority, whichever rate of pay is greater, and a penalty in the amount of the employee's average daily earnings . . . ."

### B.    Defendants Assert the Same Exemption Defenses as to All NMMs.

Defendants have raised two affirmative exemption defenses: the "professional" exemption and the "administrative" exemption.

Under the FLSA, employees working in a "bona fide professional capacity" are exempt. 29 U.S.C. § 213(a)(1). To qualify for the professional exemption, an employee

must be one (1) who is compensated on a salary basis of not less than $455 per week, and (2) whose primary duty is the performance of work requiring advanced knowledge in a field of science or learning customarily acquired by a prolonged course of specialize knowledge or instruction. 29 C.F.R. § 541.300. The primary duty of the professional exemption contains three components: (a) the employee must perform work requiring advanced knowledge, which includes the consistent exercise of discretion and judgment; (b) the advanced knowledge must come from a field of science or learning; and (3) the advanced knowledge must be customarily acquired by a prolonged course of specialized intellectual instruction. 29 C.F.R. § 541.301(a).

The FLSA also exempts employees who work in a bona fide "administrative" capacity. 29 U.S.C. § 213(a)(1). The regulations specify that to qualify for the administrative exemption, the employee must be one (1) who is compensated on a salary basis of not less than $455 per week, (2) whose primary duty is "the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers," and (3) whose primary duty includes the exercise of "discretion and judgment" with respect to matters of significance. 29 C.F.R. § 541.200.

As demonstrated by Plaintiff's contemporaneously filed partial summary judgment motion and Defendants' competing motion, class certification is appropriate because both the professional and administrative exemptions will be decided based on common evidence. (*See* ECF Nos. 126 and 139.)

**II.      Plaintiff's State Law Claims Should be Certified Under Rule 23.**

**A.      Rule 23's Certification Standards.**

A court may certify a class if the moving party satisfies the requirements set forth in Rule 23 of the Federal Rules of Civil Procedure. The Court must conduct a rigorous analysis of all the requirements that apply under Rule 23(a) and one of the requirements of Rule 23(b). *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011). Rule 23(a) provides that one or more members of a class may sue as representative parties on behalf of all members only if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a).

Rule 23(b) requires common questions of law or fact to predominate over any questions affecting only individual members, and that a class action to be the superior method for adjudicating the controversy. *Wal-Mart Stores, Inc.*, 564 U.S. at 362–63; *Postawko v. Mo. Dep't of Corrs.*, 910 F.3d 1030, 1036 (8th Cir. 2018). "Rule 23 grants courts no license to engage in free-ranging merits questions at the certification stage." *Postawko*, 901 F.R.D. at 1037 (quoting *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 466 (2013)). "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.*

## B.     The Prerequisites of Rule 23(a) are Met.

### 1.     The Proposed Class Meets the Numerosity Requirement.

Fed. R. Civ. P. 23(a)(1) requires that a proposed class be "so numerous that joinder of all members is impracticable." There is no strict numeric threshold for the numerosity requirement and "what constitutes impracticability depends on the facts of each case." *Cooper v. Miller Johnson Steichen Kinnard, Inc.*, 2003 WL 1955169, at \*2 (D. Minn. Apr. 21, 2003) (quotation omitted). This district has noted that a class of forty individuals "should raise a presumption that joinder is impracticable" and "the plaintiff whose class is that large or larger should meet the test of Rule 23(a)(1) on that fact alone." *See Lockwood Motors, Inc. v. Gen. Motors Corp.*, 162 F.R.D. 569, 574 (D. Minn. 1995) (quotation omitted); *Cruz v. TMI Hospitality, Inc.*, 2015 WL 6671334, at \*6 (D. Minn. Oct. 30, 2015) (class of approximately 67 individuals met numerosity requirement). "The numerosity requirement is more readily met where a class contains employees suing their present employer" as is the case here. *Romero v. Producers Dairy Foods, Inc.*, 235 F.R.D. 474, 485 (E.D. Cal. 2006). This is because class members may be unwilling to sue their employer individually out of fear of retaliation. *Id.*; *see also Swigart v. Fifth Third Bank*, 288 F.R.D. 177, 183 (S.D. Ohio 2012) (stating that in employment cases that "fear of retaliation is an important consideration in deciding whether joinder is impracticable and thus whether the numerosity requirement is satisfied").

Here, the Minnesota Rule 23 class consists of at least 65 NMMs. (Srey Decl. ¶ 4.) Plaintiff bases this estimate off of the FLSA notice list that Defendants provided back in

March 2022. That list captured all NMMs who had been employed with Defendants since August 8, 2018, to the time the list was provided. Numerosity is satisfied.

### 2. The Class Shares Common Questions of Law and Fact.

The commonality requirement of Rule 23(a)(2) requires "questions of law or fact common to the class." All questions need not be common—even a single common question will do. *Wal-Mart Stores, Inc.*, 564 U.S. at 359. What matters is "the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id.* at 350 (emphasis in original) (quotation omitted).

While not every question of law or fact must be common to the entire class, Plaintiff must show that the course of action giving rise to her cause of action affects all putative class members, or that at least one of the elements of that cause of action is shared by all of the putative class members. *Cooper*, 2003 WL 1955169, at *3. "Factual variances among class grievances will not defeat the commonality requirements, so long as the claims arise from a common nucleus of operative facts." *Nerland v. Caribou Coffee Co., Inc.*, 564 F. Supp. 2d 1010, 1031 (D. Minn. 2007). In sum, there must be a contention that is "capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc.*, 564 U.S. at 350. "Commonality is usually satisfied in wage cases where the plaintiffs allege that defendants had a common policy or practice of unlawful labor practices." *Chime v. Peak Sec. Plus, Inc.*, 137 F. Supp. 3d 183, 208 (E.D.N.Y. 2015) (quotation omitted).

Here, Defendants uniformly classified NMMs performing utilization reviews as professionally and administratively "exempt" from overtime under federal and state laws and did not pay them overtime for hours worked over forty in a workweek. As Plaintiff's motion for partial summary judgment demonstrates, her claim and the class's claims rise and fall together. Indeed, Defendants are not claiming that some nurses are administratively and professionally exempt while others are not. Moreover, NMMs share the same primary job duty to conduct utilization reviews, and they were subject to the similar standards, policies and processes promulgated by Defendants, consistent with national accreditation standards that are critically important to Defendants. Plaintiff and the putative class members were required to use predetermined, standardized, objective-based criteria and guidelines for their reviews. They were subject to similar utilization review processes and steps within the processes. They worked in the same computer systems to conduct their reviews and were provided with the same or substantially similar tools and resources to do their work. Defendants uniformly tracked NMMs' productivity, turn around times, errors, and commonly audited their work to ensure that all class members applied the objective criteria in a consistent and similar manner. Moreover, all NMMs were subject to the same contract governing the utilization review services Defendants contracted with BCBS to provide, the same utilization management program description outlining the utilization program itself, and the same corporate and state-wide policies, procedures, and work processes governing numerous aspects of their work including applying facts to criteria, documenting reviews, and the pace or timeliness in which they needed to complete their

work. Accordingly, common questions of law and fact exist warranting certification. These

common questions include, but are not limited to:

> •       Whether the NMMs have the primary duty of performing work requiring "advanced knowledge" for purposes of the professional exemption;

> •       Whether the NMMs, who make no decisions regarding medical care or treatment, and whose job is strictly controlled by the UM standards, contract, corporate-wide and state-wide policies, procedures, and work processes, perform work requiring advanced knowledge including the consistent exercise of discretion and judgment for purposes of the professional exemption;

> •       Whether the actual utilization work itself, which is also primarily performed by LPNs and LPNs, meets the advanced knowledge customarily acquired by a prolonged course of specialized instruction for purposes of the professional exemption;

> •       Whether the NMMs, who are the ones who are doing the actual day-to-day utilization reviews, have the primary duty of performing office or non-manual work directly related to management or general business operations of Defendants or their customers for purposes of the administrative exemption;

> •       Whether the NMMs, who make no decisions regarding medical care or treatment, and whose job is strictly controlled by UM standards, the contract between Defendants and the state, corporate-wide and state-wide policies, procedures, and work processes, are precluded from exercising discretion and independent judgment with respect to "matters of significance" for purposes of the administrative exemption;

> •       Whether Defendants failed to keep accurate time records of all hours worked by Plaintiff and the class members; and

> •       Whether Defendant's failure to pay overtime to Plaintiff and the class was willful and not in good faith.

Because NMMs performed the same primary job duty; were subject to the same state-

specific contract; operated under the same or substantially similar policies, procedures, and

work processes; were uniformly classified as administratively and professionally exempt;

and suffered similar injuries from working over forty-eight hours per week without

receiving overtime pay, the answers to these above common questions are subject to common proof. Both parties agree as they both have asked this Court to determine the merits of Defendants' defenses based on common evidence. (*See* ECF Nos. 126 and 139.)

Finally, courts routinely certify misclassification cases with similar common questions, concluding that the central question—whether the employees were wrongfully classified as exempt from overtime pay—is common to the class. *See, e.g.*, *Jacob v. Duane Reade, Inc.*, 602 F. App'x 3, 7 (2d Cir. 2015) (affirming certification of misclassified employees claiming unpaid overtime); *Prinzo v. Hannaford Bros. Co., LLC*, 343 F.R.D. 250, 252 (D. Mass. 2023) (commonality met because "whether such misclassification had indeed taken place turns on the same factual and legal inquiry: whether their 'primary duty' is the performance of exempt work"); *Ambrosia v. Cogent Commc'ns, Inc.*, 2016 WL 31356, at *12 (N.D. Cal. Jan. 4, 2016) (certifying class of for misclassification claims); *Rehberg v. Flowers Baking Co. of Jamestown, LLC*, 2015 WL 1346125, at *19 (W.D.N.C. Mar. 24, 2015) (same); *Perez v. Allstate Ins. Co.*, 2014 WL 4635745, at *25 (E.D.N.Y. Sept. 16, 2014) (same); *Boyd v. Bank of America Corp.*, 300 F.R.D. 431, 437 (C.D. Cal. 2014) (same); *Indergit v. Rite Aid Corp.*, 293 F.R.D. 632, 659 (S.D.N.Y. 2013) (same). This Court should reach the same result.

### 3.  Plaintiff Learing's Claims Are Typical of the Class.

Typicality is met if "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "Typicality is satisfied when the claims of the named plaintiffs emanate from the same event or are based on the same legal theory as the claims of the class members." *Lockwood Motors, Inc.*, 162 F.R.D.

at 575 (quotation omitted). "A strong similarity of legal theories satisfies the typicality requirement even if substantial factual differences exist." *Nerland*, 564 F. Supp. 2d at 1031–32 (quotation omitted).

Here, the injuries suffered by Plaintiff Christine Learing is the same as those of the putative class and stem from Defendants' uniform misclassification of NMMs as overtime. Plaintiff has stated that she worked over forty hours in a workweek but did not receive any overtime pay due to her exempt status. The putative class members in this case will have the same injury–unpaid overtime–since they too were uniformly classified as exempt and were not paid for any overtime hours they worked.

### 4.     Class Representative Learing and Her Counsel are Adequate.

Rule 23(a)(4) requires a showing that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Courts find the adequacy requirement met when: (1) the representatives and their attorneys are able and willing to prosecute the action competently and vigorously; and (2) each representative's interests are sufficiently similar to those of the class that it is unlikely that their goals and viewpoints will diverge. *Nerland*, 564 F. Supp. 2d at 1032.

Here, the proposed class representative, Christine Learing, satisfies the adequacy prerequisite. She seek the same legal relief as the class (overtime pay, liquidated damages, attorneys' fees and costs). She has participated significantly in this case, responding to written discovery, producing documents responsive to Defendant's requests, and sitting for a day-long deposition. (Srey Decl. ¶ 10.) Ms. Learing also has retained experienced legal counsel to represent her and class. Nichols Kaster, PLLP, satisfies the adequacy

24

requirement. They actively and vigorously pursued the Plaintiff's and the putative class's claims, by, among other things, successfully moving for FLSA conditional certification, overseeing the FLSA notice process, and engaging in representative written and deposition discovery for months. Plaintiff's Counsel has extensive experience in class action and wage and hour litigation and is recognized as a leader in wage and hour litigation. (*See generally* Firm Resume, Ex. 43.) As the Court noted *in Netzel v. W. Shore Grp., Inc.*, "other Courts in this District . . . have previously noted that the Nichols Kaster firm is well known for its experience in wage and hour litigation, and the Courts have found the firm competent of representing a class or collective." 2017 WL 1906955, at *6 (D. Minn. May 8, 2017).

### C.     The Predominance and Superiority Requirements of Rule 23(b)(3) are Satisfied.

Plaintiff must also satisfy one of the subsections of Rule 23(b), which requires that (1) questions of law or fact common to the class members predominate over individual questions; and (2) the class action is superior to available methods for the fair and efficient adjudication of the controversy. *See Nerland*, 564 F. Supp. 2d at 1034.

#### 1.     Common Issues Predominate.

Rule 23(b)(3)'s predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation. *Amchem*, 521 U.S. at 623. Claims need not be identical for common issues of law and fact to predominate, they need only be reasonably co-extensive with those of absent class members. *Hanlon*, 150 F.3d at 1120. Predominance compares common and individual questions in a case. *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (individual question requires plaintiffs

"to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.") Moreover, "[a]n internal policy that treats all employees alike for exemption purposes suggests that the employer believes some degree of homogeneity exists among the employees" and is a factor to consider for predominance. *In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 571 F.3d 953, 957 (9th Cir. 2009).

Here, Defendants have uniformly treated all putative class members alike, classifying them all as exempt, claiming the same exact exemptions apply without regard to any individual claim. Plaintiff's misclassification overtime claim is the center of this case, and the exemption analysis therefore drives the entire case. As outlined above, the most important questions are common: 1) whether NMMs' primary duty requires the consistent exercise of discretion and judgment within the meaning of the professional and administrative exemptions; 2) whether utilization review work that Plaintiff and the class performed required advanced academic instruction; and 3) whether NMMs' primary job duties are "directly related to management policies or general business operations" of Anthem or its customers. Because NMMs share the same primary job duty, were subject to uniform standards and performed their utilization review jobs in substantially similar ways, these questions are common, will bind the class, and will predominate over the

litigation. These questions predominate over any individual issues, which generally relate to damages (such as how many hours an NMM worked during a workweek).[10]

### i. Professional Exemption: Whether NMMs' Duties Required Advanced Knowledge Customarily Acquired by a Prolonged Course of Specialized Intellectual Instruction

The learned professional exemption is limited to positions where a standard prerequisite for the job requires specialized academic training.[11] 29 C.F.R. § 541.301(d); *see id.* § 541.301(f) ("When an advanced specialized degree has become a standard requirement for a particular occupation, that occupation may have acquired the characteristics of a learned profession."). Importantly, the relevant focus "in analyzing the availability of the learned professional exemption is on the *minimum requirements* for the job." *Clark v. Centene Co. of Texas*, 44 F. Supp. 3d 674, 679 (W.D. Tex. 2014), *aff'd*, 656 F. App'x 688 (5th Cir. 2016) (emphasis added). An employer's arbitrary requirements are of no consequence. *See Rego*, 367 F. Supp. 3d at 861–62 (finding the de facto requirements necessary to perform the job controlling rather than the employer's requirements because "the regulations make clear that the learned professional exemption is reserved for professions 'where specialized academic training is a *standard* prerequisite for entrance

---

[10] It is well-established that individual damages issues cannot defeat certification. *See Cruz v. TMI Hospitality, Inc.*, 2015 WL 6671334, at *9 (D. Minn. Oct. 30, 2015) ("[L]iability—not damages is the focus of the commonality and predominance inquiries.").

[11] LVNs and LPNs generally do not satisfy the learned professional exemption because they do not require an advanced degree acquired by a prolonged course of specialized intellectual instruction. *See* 29 C.F.R. § 541.301(e)(2).

into the profession'"); *Young v. Cooper Cameron Corp.*, 586 F.3d 201, 206 (2d Cir. 2009) ("If a job does not require knowledge customarily acquired by an advanced educational degree . . . then, regardless of the duties performed, the employee is not an exempt professional under the FLSA."). Given the focus on the position's requirements, and not an individual's own education, "[i]t is [] apparent on its face that this exemption is susceptible to common proof." *Kress v. Pricewaterhouse Coopers LP*, 2013 WL 140102, at \*5 (E.D. Cal. Jan. 10, 2013).

Here, as discussed above, national UM standards, corresponding company policy documents, and Defendants' hiring practices demonstrate that LPNs and LVNs are qualified to primarily perform utilization reviews just like Plaintiff and the putative class.

### ii.   Administrative Exemption: Common Issues Predominate Whether NMMs' Primary Duty was Related to Defendant's General Business Operations or Management

The administrative exemption requires an employee's primary duty be work "directly related to the management or general business operations" of the employer or its customers.[12] 29 C.F.R. § 541.201(a).

---

[12] The Department of Labor's regulations explain that "[w]ork directly related to management or general business operations includes, but is not limited to, work in functional areas such as tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing; research; safety and health; personnel management; human resources; employee benefits; labor relations; public relations, government relations; computer network, internet and database administration; legal and regulatory compliance; and similar activities." 29 C.F.R. § 541.201(b).

This means the employee "must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment." *Id.* "[The second prong] is met if the employee engages in running the business itself or determining its overall course or policies, not just in the day-to-day carrying out of [the] business' affairs." *Bothell v. Phase Metrics, Inc.*, 299 F.3d 1120, 1125 (9th Cir. 2002) (quotations omitted). "Thus, in the end, the critical focus regarding this element remains whether an employee's duties involve the running of a business as opposed to the mere day-to- carrying out of the business's affairs." *Calderon v. GEICO Gen. Ins. Co.*, 2015 WL 9310544, at *7 (4th Cir. Dec. 23, 2015) (internal quotations and citations omitted).

Here, common proof shows NMMs' primary duty does not directly relate to Defendants' or their customers' management or general business operations. As Ms. Stokes testified and the standardized policies and procedures show, NMMs are the ones who are providing the very service that Defendants contracted with BCBS to provide, i.e., utilization review services. Plaintiff and the putative class conducted their utilization reviews using objective-based criteria and they were subject to specific performance standards including productivity goals. Their duties did not include creating or formulating Defendants' guidelines or criteria or policies and processes used for reviews. Plaintiff and the putative class did not direct or service the overall direction of Defendants' business. Given NMMs' uniform primary duty, class-wide proof will show it was not related to Defendants' or their customers' general business operations or management.

### iii.     Professional and Administrative: Whether NMMs Consistently Exercised the Requisite Discretion and Judgment

The "professional" and "administrative" exemptions require an employee to perform work that requires the consistent exercise of discretion and judgment. *See* 29 C.F.R. § 541.301(b); 29 C.F.R. § 541.202(a). The consistent exercise of discretion and judgment is work requiring advanced knowledge. The work has to be predominantly intellectual in character, rather routine. *See* 29 C.F.R. § 541.301(b); *see also* 29 C.F.R. § 541.202(e). "In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered." 29 C.F.R. § 541.202(a) (discussing   discretion and independent conduct under the administrative exemption). Exercising discretion and independent judgment requires "more than the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources." *Id.* § 541.202(e). An employee's ability to make relatively minor decisions also does not constitute discretion and independent judgment, as the regulations recognize that so long as an employer's rules, standards, or guidelines establish "closely prescribed limits" within which employees operate, employees do not exercise discretion and independent judgment. *See id.* § 541.704.

Common issues predominate concerning NMMs' ability, or lack thereof, to exercise discretion and judgment as part of their primary duty. Consistent with NCQA standards, utilization review is designed to limit discretion and judgment. The evidence demonstrates the rigid confines in which Plaintiff and the putative class members had to perform reviews.

These UM standards and corporate policies and processes explain that NMMs are required to use written objective evidence-based criteria for their reviews, in the sequential order dictated by Defendants, that applying the criteria consistently from one authorization request to the next is of critical import, and that NMMs are prohibited from denying an authorization that does not satisfy criteria. There is a right and wrong answer and Plaintiff and the putative class are tested on their ability apply the criteria correctly to get the answer right. These common facts and policies will allow Plaintiff to show NMMs class-wide did not exercise discretion and independent judgment.

### 2.    A Class Action is Superior.

Class certification is appropriate if class resolution is "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Rule 23(b)(3) lists four superiority factors: (1) the class members' interests in individually controlling the prosecution of separate actions; (2) the extent and nature of other pending litigation about the controversy by members of the class; (3) the desirability of concentrating the litigation in a particular forum; and (4) the likely difficulties in managing a class action. *Tinsley*, 2016 WL 393577, at *10 (quoting Fed. R. Civ. P. 23(b)(3)(A)-(D)).

First, there is no evidence that putative class members have any interest in individually pursuing their claims. On the contrary, class members may be less apt to individually pursue claims for fear of reprisal by their employer and the prospect that pursuing individual litigation would be cost prohibitive. Second, Plaintiff is not aware of any other lawsuits, either individually or as a class, concerning utilization reviewers' unpaid overtime claims against Defendants. Third, approximately 65 current and former

NMMs worked for Defendants in Minnesota, making this forum appropriate to protect their rights. Fourth, the class will be manageable since the same policies and practices applied uniformly to members of the putative class.

### D. The Proposed Notice Meets Rule 23's Requirements and Should be Approved.

Plaintiff's proposed class notice is attached as Exhibit 44. This notice was modeled after the Federal Judicial Center's sample class notice, and is fair, accurate, and informative. The Court should approve Plaintiff's notice and require Defendants to produce a list of all class members within ten days of the Court's order.

## CONCLUSION

Plaintiff respectfully requests that the Court (1) certify the Rule 23 class; (2) approve the form of Plaintiff's proposed Class Notice; (3) set a 45-day notice period; (4) authorize Plaintiff's Counsel to mail the Notice at the beginning of the 45-day notice period; (5) appoint Christine Learing as Class Representative; (6) appoint Nichols Kaster, PLLP as Class Counsel; and (7) order Defendants to produce a list of all medical management nurses who worked for Defendants in Minnesota at any time three years prior to the filing date of the Complaint to the present.

DATED: April 24, 2023                   **NICHOLS KASTER, PLLP**

                                        */s/ Rachhana T. Srey*
                                        Rachhana T. Srey, MN Bar No. 340133
                                        Caitlin L. Opperman, MN Bar No.
                                        0399978
                                        4700 IDS Center
                                        80 South Eighth Street
                                        Minneapolis, MN 55402

Telephone: (612) 256-3200
Facsimile: (612) 338-4878
srey@nka.com
copperman@nka.com

**Attorneys for Plaintiff, the FLSA Collective, and Minnesota Rule 23 Class**