## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Christine Learing, *individually and on behalf of all others similarly situated*,<br><br>    Plaintiff,<br><br>v.<br><br>The Anthem Companies, Inc.; Amerigroup Corporation; and Amerigroup Partnership Plan, LLC,<br><br>    Defendants. | Civ. No. 21-2283 (JWB/DJF)<br><br><br>**ORDER ON SUMMARY JUDGMENT AND CLASS CERTIFICATION** |

Caitlin L. Opperman, Esq., Michele R. Fisher, Esq., and Rachhana T. Srey, Esq., Nichols Kaster PLLP, counsel for Plaintiff.

Brett Christopher Bartlett, Esq., Kevin Michael Young, Esq., Lennon Haas, Esq., and Thomas J. Posey, Esq., Seyfarth Shaw LPP, counsel for Defendants.

This is a dispute over alleged misclassification of utilization review nurses as exempt from Fair Labor Standards Act ("FLSA") overtime pay requirements. Plaintiff Christine Learing seeks to represent an FLSA collective and Rule 23 class of similarly situated utilization review nurses in Minnesota challenging their exemption status. The Defendants are the Anthem Companies, Inc. and its subsidiaries Amerigroup Corporation and Amerigroup Partnership Plan, LLC (collectively "Anthem"). Anthem hires nurses to review medical authorization requests submitted by healthcare providers to determine whether the services they have provided were medically necessary and therefore eligible for coverage—a process known as medical management or utilization review.

Anthem contends that Learing and the utilization review nurses she seeks to represent were properly classified as a category of employees ineligible for overtime pay ("exempt") and moves for summary judgment. Learing also seeks summary judgment. She contends that utilization review positions like hers should not be exempt from overtime pay, and that Anthem has shown no evidence that its overtime exemption decision, denying employees their overtime pay, was made in good faith. Anthem also moves to decertify the previously certified FLSA collective. Learing, in turn, moves to certify a Rule 23 class asserting similar claims under Minnesota law. For the reasons below, Learing's motions are granted, and Anthem's motions are denied.

## BACKGROUND

Health insurance companies, like Anthem, employ utilization reviewers to confirm or deny the necessity of medical treatments. These decisions are based on whether the treatments align with established medical care standards, using clinical guidelines to decide whether insurance coverage is approved or denied. In Minnesota, Anthem has hired various workers to perform utilization review work for Medicaid plans as part of a contract with Blue Cross Blue Shield. Some positions require the reviewer to be a licensed practical nurse ("LPN") and are paid hourly, while others require licensure as a registered nurse ("RN") and are paid a salary.

This case involves the salaried RN utilization review positions at Anthem—specifically the roles of Nurse Medical Management I, II, Senior, and Lead, among others with similar titles. These Nurse Medical Managers ("NMMs") handle authorization requests, which are directed to specific review teams that handle different types of

requests. Each request assigned to an NMM involves reviewing clinical data in Anthem's digital system, reading relevant clinical guidelines, and comparing whether the medical documentation meets the necessary medical criteria. If the criteria are present, the NMM grants authorization; if not, the decision is escalated to a licensed physician Medical Director for final determination.

Utilization review skills are not taught in nursing school but are acquired through on-the-job orientation, training, and experience. Anthem's training for NMMs includes how to use the company's digital systems to handle requests, as well as mock exercises on applying medical necessity criteria. Newly hired NMMs are also paired with experienced NMMs for mentorship and additional training.

NMMs at Anthem must follow Anthem's step-by-step process for conducting utilization review, no matter the specific team to which they are assigned or the substance of the authorization request. While the nature of each request determines the clinical guidelines that must be considered, the process of comparing the request's underlying medical records to the applicable guidelines does not vary. Each approval request is routed through Anthem's review framework using Anthem's digital system.

The National Committee for Quality Assurance ("NCQA"), an accrediting organization, sets industry standards for managed care organizations that perform medical necessity reviews. Anthem has tailored its utilization management policies and procedures to satisfy NCQA requirements across a range of requirements, including program structure, clinical criteria, staff qualifications, turnaround time for requests, and case documentation. NCQA requires at least LPN-level credentials for utilization review

tasks. Although Anthem previously mixed LPNs and RNs in review teams, it now differentiates roles, reserving certain authorization tasks for LPNs that do not demand nursing judgment.

Anthem's contract with Blue Cross Blue Shield mandates that the company's utilization management program comply with NCQA standards. To maintain this compliance, Anthem conducts regular audits of its utilization review processes. These audits assess how well NMMs follow proscribed steps for processing requests, the accuracy of their decisions, and their productivity. Part of this assessment involves mandatory Inter-Rater Reliability ("IRR") tests to ensure consistent application of medical necessity guidelines across reviewers. The IRR presents a series of short case summaries and asks a true or false question of whether the member in each case meets the criteria for the requested service. (*See* Doc. No. 150-21.) NMMs scoring below 90% on an IRR assessment face corrective action.

NMMs' workload sometimes demands more than 40 hours in a week. This lawsuit seeks overtime compensation for those additional hours worked.

## DISCUSSION

## I.   Certification of Collective Proceedings

Whether to certify or decertify a collective proceeding is discretionary. *See Bouaphakeo v. Tyson Foods, Inc.*, 765 F.3d 791, 796 (8th Cir. 2014) (citations omitted). Whether collective proceedings are warranted depends on first understanding the nature of the claims presented, and then considering whether common issues compel their resolution. *See, e.g.*, *Frank v. Gold'n Plump Poultry, Inc.*, Civ. No. 04-1018 (PJS/RLE),

2007 WL 2780504, at *4–5 (D. Minn. Sept. 24, 2007). Analyzing the case at the appropriate level of abstraction is key because "[i]f one zooms in close enough on anything, differences will abound." *Id.* at *4. But "[a]ny competently crafted class complaint literally raises common questions." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 (2011).

The core issue in this overtime pay dispute is whether utilization review work performed by NMMs at Anthem falls under exempt categories, meaning not qualifying for overtime pay. Learing argues that collective proceedings are proper because NMMs are uniformly governed by Anthem's overarching policies, training protocols, and performance expectations, regardless of their specific areas of work. On the other hand, Anthem argues against collective proceedings, emphasizing the diverse work settings and case complexities faced by NMMs based on the nature of their assigned authorization requests and corresponding medical criteria.

The resolution here hinges on examining Anthem's employment policies at a structural level rather than individual NMM performance particularities. Despite some differences in NMMs' assignments, all operate under a common employment framework that outlines their main duties, individual authority levels, and job performance standards. Consequently, for FLSA certification purposes, NMMs are deemed similarly situated within Anthem's employment structure. For class certification, the common questions about Anthem's employment framework for NMMs and related roles predominate over individual discrepancies.

## A.      Defendants' Motion to Decertify FLSA Collective

The FLSA permits collective action when the plaintiff presents a group of similarly situated employees who "suffer from a single, FLSA-violating policy, and when proof of that policy or of conduct in conformity with that policy proves a violation as to all the plaintiffs." *Bouaphakeo*, 765 F.3d at 796 (quotation omitted); 29 U.S.C. § 216(b).

To decide whether FLSA claimants are similarly situated, courts consider: (1) the extent and consequences of disparate factual and employment settings, (2) the available defenses that appear to be individual to each plaintiff, and (3) fairness and procedural considerations. *See Cruz v. Lawson Software, Inc.*, 764 F. Supp. 2d 1050, 1056 (D. Minn. 2011) (quotation omitted). After discovery, plaintiffs must show that the claimants are similarly situated—though not necessarily identical—to proceed with an FLSA collective action. *See Frank*, 2007 WL 2780504, at *2–3 (citations omitted); *Cruz v. TMI Hosp., Inc.*, Civ. No. 14-1128 (SRN/FLN), 2015 WL 6671334, at *14 (D. Minn. Oct. 30, 2015) (citing *Nerland v. Caribou Coffee Co.*, 564 F. Supp. 2d 1010, 1018 (D. Minn. 2007)). The decertification decision falls within a court's discretion. *Id.* (citation omitted).

### 1.      Disparate Factual and Employment Settings

An inherent tension exists between Anthem's summary judgment argument—that all NMMs fit within either the administrative or learned professional overtime exemption—and its opposition to collective proceedings, citing differences in NMM subject areas and work settings. This contradiction highlights the need to evaluate at the appropriate level of abstraction. The key question is whether the plaintiffs' differences are substantial enough to outweigh their common experiences under the alleged FLSA-

violating practices. *See White v. 14051 Manchester Inc.*, 301 F.R.D. 368, 372 (E.D. Mo.

2014) (quotation omitted). On balance here, the similarities of Anthem's practices with

respect to NMMs outweigh the individual variations among NMMs that Anthem

identifies. The employment policies that oversee all NMMs establish a significant

structural similarity across positions, despite variations in job settings or medical areas.

The structural similarity across the NMM positions is apparent from the record.

Anthem uses standardized job descriptions for each level of NMM position that do not

vary based on the substance of the authorization requests that the position will process.

The job descriptions in the record for the NMM I, NMM II, and NMM Lead positions are

all but identical in their description of the positions' primary duties. (*See generally* Doc.

No. 150-1.) All NMMs are required to follow Anthem's policies and procedures,

regardless of their practice group or the type of authorization requests they handled. What

clinical guidelines were used by which NMMs, substantive differences between the

guidelines, or that certain authorization requests were more or less complex than others

are all secondary to the commonalities of the NMM jobs' structure, qualifications,

procedures, and scope of authority. All NMMs can approve requests but none can deny.

All are subject to the same performance evaluation metrics and productivity expectations.

Anthem's contention that differences in case types, job complexities, and

individual testimonies on work volume and setting make collective adjudication

unfeasible is belied by the overarching similarities in job structure, qualifications,

procedures, and authority scope shared among NMMs. Although individual NMMs may

experience variations in their day-to-day duties, these do not subvert the central question

of whether their primary job duty of conducting utilization review constitutes nonexempt work under the FLSA. Thus, despite some individual variability, NMMs are similarly situated in Anthem's utilization management program and all face the same alleged FLSA violation: their work was misclassified as exempt from overtime pay.

### 2.    Anthem's Individualized Defenses

Anthem asserts that two FLSA overtime exemptions apply here to all NMM plaintiffs—the administrative or learned professional overtime exemption. Under the circumstances of this case, however, those exemption defenses do not require such extensive individualized analysis as might warrant decertification of the collective action. As Learing asserts, the common structural aspects of the NMMs' employment are enough to decide their proper exemption status. Unduly focusing on an individual NMM's workload ignores Anthem's actions that apply equally to all NMMs regardless of the medical substance of the individual assignments. Regardless of the type of authorization request, NMMs are subject to the same job performance expectations, receive the same training on Anthem's utilization management system, and have their work monitored and evaluated in the same way.

Anthem also references the combination exemption under 29 C.F.R. § 541.708 as a defense that requires individualized analysis but does not develop the argument. (*See* Doc. No. 134 at 15–16.) At most, that exemption might apply to an NMM primarily performing some combination of exempt duties other than utilization review. Should Anthem show that such an inquiry is warranted against an individual plaintiff, it can introduce individualized evidence as needed. But merely referencing the exemption does

not warrant decertification. In sum, Anthem's exemption defenses are individualized in appearance only; whether any exemption applies remains a matter of common resolution.

### 3.    Fairness and Procedural Considerations

Any collective proceeding poses certain logistical difficulties, but those difficulties do not render proceeding collectively to be less efficient or expedient than conducting many individual trials litigating essentially the same liability issues. Anthem's logistical concerns are not so significant that a collective trial would be unmanageable. Those NMMs who have already been deposed offer testimony about their common and individualized work experience at Anthem, and they represent a cross-section of the various NMM teams and groups within Anthem's organization. Anthem's corporate witnesses and internal documents and policies represent the company's actions. That representative evidence would permit a factfinder to determine the central liability question here: whether NMMs' primary duty of utilization management as performed within Anthem's system constitutes exempt or nonexempt work.

Anthem also raises concerns about how to fairly calculate damages, arguing that Learing has not put forward an adequate plan for doing so. Concerns over calculating damages, influenced by individual circumstances, do not invalidate the appropriateness of collective adjudication. *See Cruz*, 2015 WL 6671334, at *17. This aligns with the general principle that wrongfully classified employees should not be denied recovery simply because they cannot precisely prove the extent of their uncompensated work due to their employer's failure to keep accurate records for those classified as exempt. *See Holaway v. Stratasys, Inc.*, 771 F.3d 1057, 1059 (8th Cir. 2014) (citation omitted).

This matter does not involve variable pay rates or a payment scheme that depends on the type of work performed. It presents a straightforward damages question: if NMMs were not properly exempted, they would have a right to overtime pay for all weeks in which they worked hours that should have been treated as overtime hours and paid accordingly. If necessary, trial could be bifurcated into a liability and a damages phase. But differences in the amount of each individual NMM's alleged overtime hours or the possibility that some NMMs did not work any overtime does not compel decertification.

Therefore, Anthem's motion to decertify the FLSA collective is denied.

**B.      Plaintiff's Motion to Certify Rule 23 Class**

Whether to certify a class under Rule 23 is left to the reviewing court's broad discretion. *See Cruz*, 2015 WL 6671334, at *4 (citing *Shapiro v. Midwest Rubber Reclaiming Co.*, 626 F.2d 63, 71 (8th Cir. 1980)). To certify a class, the plaintiff must meet all the requirements of Rule 23(a) and at least one subsection of Rule 23(b). *Id.* (quoting *In re St. Judge Med., Inc.*, 425 F.3d 1116, 1119 (8th Cir. 2005)).

Rule 23(a) requires Learing to demonstrate that (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. *See id.* (quoting Fed. R. Civ. P. 23(a)). Learing seeks certification under Rule 23(b)(3), which provides for class certification if common questions of law or fact predominate over individual questions and a class is the superior method to adjudicate the controversy fairly and efficiently. *See* Fed. R. Civ. P. 23(b)(3).

Learing's proposed Minnesota class will be certified because the central question—whether NMMs performing their roles, as outlined and evaluated by Anthem, are doing nonexempt work—remains consistent across the class. This dispute centers on a common issue of how NMMs' utilization review duties are executed within Anthem's employment framework, which is subject to class-wide evidence and does not require individualized evidence for each type of authorization request reviewed.

### 1.      Numerosity

This District has noted that a putative class of more than 40 is presumptively sufficient. *See, e.g.*, *Cruz*, 2015 WL 6671334, at *5–6 (citing *Lockwood Motors, Inc. v. Gen. Motors Corp.*, 162 F.R.D. 569, 574 (D. Minn. 1995)). Learing's proposed class includes at least the 65 NMMs that received the FLSA collective notice but could include more given that the proposed class might include current Anthem employees. *See Nerland*, 564 F. Supp. 2d at 1031 (disagreeing that notice of FLSA collective accounted for all potential class members). Numerosity is satisfied here.

### 2.      Commonality

Commonality requires the presence of a common contention capable of class-wide resolution. *Cruz*, 2015 WL 6671334, at *7 (quoting *Dukes*, 564 U.S. at 350). It requires the class members to have suffered the same injury. *Id.* (quoting *Luiken v. Domino's Pizza, LLC*, 705 F.3d 370, 376 (8th Cir. 2013)). Even though individuals may not be situated identically, commonality remains when the legal question linking class members is substantially related to resolving the litigation. *See Nerland*, 564 F. Supp. 2d at 1031 (citations omitted). Factual variances will not defeat commonality if the claims arise from

a common factual nucleus. *Id.* (citation omitted).

Learing clears the commonality bar because each NMM allegedly suffered the same injury: wrongful classification as overtime exempt. Whether NMMs qualify as exempt is the fundamental contention in this suit, which can be resolved in one stroke. As explained further in the predominance analysis below, individual dissimilarities among NMMs do not have the potential to impede answering the common liability question, which is asked and answered based on Anthem's common practices.

### 3.   Typicality

Typicality is fairly easily met, so long as the purported class members have claims much like the named plaintiff. *Postawko v. Missouri Dept. of Corr.*, 910 F.3d 1030, 1039 (8th Cir. 2018) (quotation omitted). Factual variations seldom preclude certification if each claim stems from the same conduct and raises the same legal or remedial theory as the class claims. *See id.* (quoting *Alpern v. UtiliCorp United, Inc.*, 84 F.3d 1525, 1540 (8th Cir. 1996)).

Learing also clears the typicality bar. Anthem classified its NMMs as overtime exempt and paid them a salary. The wrongful classification allegedly suffered by Learing is the same as that suffered by the proposed class of salaried NMM workers. Whether an NMM's primary duty to perform utilization review qualifies as exempt work is the fundamental legal question at issue. That question can be answered across the board by finding that utilization review work—as performed by NMMs at Anthem and subject to commonly applicable policies and procedures—does or does not qualify as exempt work.

### 4.     Adequate Representation

Certifying Learing as the representative plaintiff does not present any obvious concerns. Anthem raises no concern or argument about Learing that it could not raise about any other class member. And as Anthem points out, Learing has experience working on NMM teams that process different request types and therefore examine different medical necessity criteria. The proposed class counsel has been recognized in this District for experience in wage and hour litigation and is competent to represent a class or collective. *See Netzel v. West Shroe Grp., Inc.*, Civ. No. 2017 WL 1906955, at *6 (D. Minn. May 8, 2017) (collecting cases). Therefore, Learing and her attorneys are adequate to represent the class.

### 5.     Rule 23(b) Factors

#### a.     Predominance

Predominance in the context of Rule 23(b)(3) involves a detailed evaluation; simply having a common question among the class members is not enough to meet this criterion. *See Ebert v. Gen. Mills, Inc.*, 823 F.3d 472, 478 (8th Cir. 2016). The essence of predominance is assessing whether the class is unified enough for a collective legal action to be appropriate. *See Luiken v. Domino's Pizza, LLC*, 705 F.3d 370, 377 (8th Cir. 2013). This involves determining whether plaintiffs can present a plausible claim of wrongdoing using evidence that applies broadly across the class. *See Drake v. Steak N Shake Operations, Inc.*, 286 F. Supp. 3d 1040, 1052 (E.D. Mo. 2017). Individual questions might require unique evidence for each class member, while common questions can be addressed with uniform evidence or are suitable for resolution as a group. *See id.*

The predominance inquiry focuses on liability. *See Nerland*, 564 F. Supp. 2d at 1035.

Here, liability turns on whether Anthem appropriately classified NMMs as exempt administrative employees or learned professionals, which depends on the primary duties assigned to the NMM role. Learing offers a path to answering the exemption question based on common evidence, while Anthem frames the question at too granular a level. The proposed Minnesota class includes NMMs who were employed by Anthem in Minnesota, paid on a salary basis, expected to use the same Anthem systems and processes for reviewing authorization requests, and subject to the same expectations and performance evaluation. The evidence includes consistent job descriptions, Anthem's policies applicable to all, and testimonies about the responsibilities tied to utilization review. The record lacks evidence that Anthem decided NMMs' exemption status worker by worker, rather than collectively as a group.

Anthem's argument that NMM roles differ significantly in primary duties is challenged by its own admissions that utilization review is the main responsibility for most NMM positions. Anthem argues that utilization review is not the main duty of an NMM Lead, pointing to a declaration from a medical manager in Indiana who states that the NMM Lead on her team acts as an assistant manager and conducts no medical necessity reviews. (*See* Doc. No. 169-1 at 7 ¶ 18.) That goes against Anthem's job description for the NMM Lead position, which states that the NMM Lead role's primary duties include utilization review activities identical to those in the other NMM roles. (*See generally* Doc. No. 150-1.) In addition, testimony from the Opt-In Plaintiff that worked as an NMM Lead for Anthem in Minnesota was that half of her work was spent on

14

utilization review. The NMM positions included in the proposed Minnesota class all had the same primary work duty.

Furthermore, on closer inspection, Anthem's argument about differing NMM job duties relates mainly to the varying substance of authorization requests. Although there is variation in the substance of the requests (which in turn compels the use of a different set of clinical guidelines), the overall process and expectations for how NMMs are meant to process a request from start to finish is set by common Anthem policies and practices. All NMMs follow a set procedure governed by Anthem's overarching policies and practices. The process and expectations for managing authorization requests are consistent across the board, meaning variations in request details do not change the fundamental job duty of conducting utilization reviews within Anthem's system.

In sum, the individualized differences Anthem highlights are not so consequential that they overcome the structural commonalities that apply to NMMs regardless of their team or the substance of their assigned authorization requests. Although individual NMMs varied in their daily routines and work settings, those variations have minimal relevance or effect on the central questions relating to whether the positions' primary duty—utilization review—constitutes exempt or nonexempt work. *Cf. Bouaphakeo*, 765 F.3d at 797 (variations in individual plaintiffs' donning and doffing routines did not present individualized issues that dominated the action and would prevent collective resolution). Individualized issues therefore do not predominate over the more substantial and consequential common questions to preclude certification under Rule 23(b).

### b. Superiority

Superiority considers (1) the interest of class members in controlling a separate action; (2) the extent and nature of existing litigation about the controversy; (3) the desirability of concentrating the litigation in a particular forum; and (4) the difficulties likely to be encountered in managing a class action. *See Nerland*, 564 F. Supp. 2d at 1035 (citing Fed. R. Civ. P. 23(b)(3)). These four factors favor finding superiority here.

As Learing contends, it seems unlikely that individual NMMs would benefit more from individual actions than from this collective lawsuit, but any individual desiring to opt out will be given the opportunity. Currently, no other Minnesota case addresses these same issues. Therefore, it is sensible to gather all similar claims from Minnesota workers into one case, handled in a Minnesota forum.

Although Anthem raises concerns about the complexity of managing a class action because of the varied duties among NMM roles, such challenges can be addressed through methods like subclassing or modifying the class certification if necessary. Testimonies from NMMs about their expected duties and Anthem's operational procedures indicate that the main issues, particularly those related to liability, can be resolved with evidence that applies broadly across the class. Whether a given NMM on a certain team qualifies as exempt will not turn on that individual NMM's understanding of how to carry out Anthem's policies and procedures. The commonly applicable policies and procedures will determine whether an exemption applies.

Collective proceedings are superior for addressing the core issues of this case. Whether Anthem's NMMs in Minnesota performed exempt or nonexempt work within

Anthem's utilization management program can effectively be resolved with common or representative evidence. The substantive differences between NMM teams are variations of a common function within Anthem's employment structure: medical necessity review of authorization requests. Therefore, conducting multiple individual trials rather than a class action would be repetitive and inefficient, given the uniformity of the central question across all NMM roles. Accordingly, a class action is the superior method of adjudicating at least the liability question presented here.

Learing's motion to certify the proposed Minnesota class is granted.

## II.   Summary Judgment

Having addressed the parties' motions for and against collective proceedings, the analysis turns to their cross-motions for summary judgment.

### A.   Legal Standard

Cross-motions for summary judgment do not change the summary judgment standard. *Hanson v. Loparex, Inc.*, 809 F. Supp. 2d 972, 977 (D. Minn. 2011). Summary judgment is proper if the record establishes that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). To determine which facts are material, courts should look to the substantive law in a dispute and identify the facts which are critical to the outcome. *Com. Union Ins. v. Schmidt*, 967 F.2d 270, 272 (8th Cir. 1992). A genuine issue of material fact exists when the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). If the evidence permits a verdict for the nonmoving party, then summary judgment is inappropriate. *See Krenik v. Cnty. of Le*

*Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). On summary judgment, evidence is considered in the light most favorable to the nonmoving party, drawing all reasonable inferences in that party's favor. *See Windstream Corp. v. Da Gragnano*, 757 F.3d 798, 802–03 (8th Cir. 2014).

### B.     Analysis of Anthem's Overtime Exemption Defenses

As the employer, it is Anthem's burden to prove that an overtime exemption applies, and it must do so by showing that the employees fit "plainly and unmistakably within the exemption's terms and spirit." *Cruz*, 764 F. Supp. 2d at 1065 (quoting *Spinden v. GS Roofing Prods. Co.*, 94 F.3d 421, 426 (8th Cir. 1996)). Anthem contends that Learing and the NMMs conclusively qualify for the administrative exemption under 29 C.F.R. § 541.200 and the learned professional exemption under 29 C.F.R. § 541.301.

Courts are instructed to interpret FLSA exemptions in a balanced manner, neither too narrowly nor with bias towards either employees or employers. *See Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018); *Coates v. Dassault Falcon Jet Corp.*, 961 F.3d 1039, 1047 n.7 (8th Cir. 2020). The analysis of the exemptions focuses on the nature of the workers' primary duties and not on who performs the work. *See* 29 C.F.R. §§ 541.200 ("any employee . . . whose primary duty is . . ."); 541.301 ("an employee's primary duty must be . . ."). What matters are the actual job responsibilities rather than facial titles or qualifications. To decide the issue based on Anthem only hiring RNs for NMM positions is to avoid examining the job duties themselves. *Cf. Rego v. Liberty Mut. Managed Care, LLC*, 367 F. Supp. 3d 849, 862 (E.D. Wis. 2019) (citations omitted). And this is not a matter of simply invoking "magic words" such as "judgment"

or "discretion" in reference to employees' duties—the important inquiry is what the job responsibilities in fact entail. *See Rego*, 367 F. Supp. 3d at 860 ("That Plaintiffs may use the words 'nursing rationale or 'clinical judgment' when speaking about their work does not transform the nature of the work itself. To allow the use of such terminology to trigger an exemption without a close look at the job duties would undermine the purpose of the FLSA maximum hours provision.").

Under the regulations, determining whether an employee is exempt from overtime involves assessing if their salary and primary job responsibilities align with specific regulatory criteria. *See* 29 C.F.R. § 541.2 ("The exempt or nonexempt status of any particular employee must be determined on the basis of whether the employee's salary and duties meet the requirements of the regulations . . . ."). It is not disputed that the NMMs here meet the salary requirement for exemption, making the decisive issue for summary judgment the characteristics of their primary work duties.

The two FLSA exemptions under consideration here are the administrative exemption and the learned professional exemption.

### 1.    Administrative Exemption

Two elements must be satisfied to qualify for the administrative exemption: (1) the primary duty is performing office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and (2) the primary duty includes the exercise of discretion and independent judgment with respect to matters of significance. 29 C.F.R. § 541.200(a). The "primary duty" is the principal, main, major, or most important duty. *Id.* § 541.700(a). The primary duty is utilization

review work performed by NMMs at Anthem in Minnesota.

### a. Directly related to management or general business operations

NMMs' role in reviewing authorization requests per Anthem's contracts with Blue Cross Blue Shield raises questions about whether their work directly relates to assisting with the running or servicing of Blue Cross Blue Shield's business, contrasted to performing occupational functions like production line or product sales workers. *See* 29 C.F.R. § 541.201(a). The record reflects that NMMs operate more similarly to production line workers than to business consultants who manage or service the customer's business.

While NMMs' medical necessity decisions play a part in customer operations by determining insurance payment authorizations, they do not engage in direct business management activities. NMMs do not directly consult insurance company customers about how they go about processing insurance coverage; do not perform work that directly relates to how customers operate as a business; and are not directly involved in managing, operating, or otherwise running the customers' businesses. NMMs' work product is their response to an authorization request. That response is then used by customers like Blue Cross Blue Shield to carry out their business functions that depend on having that response. But the NMMs have no involvement at that point.

Because the record does not support a finding that NMMs' primary duties are directly related to managing or assisting in the general business operations of Anthem or Anthem's customers, Anthem does not meet the initial requirement for the administrative exemption. Summary judgment is thus granted for Learing on that basis.

**b.    Discretion and independent judgment**

Despite Anthem's failure on the first "directly related" requirement, the administrative exemption's requirement for discretion and independent judgment is also not met. The exemption criteria require that discretion and judgment involve evaluating and deciding among various actions, not merely following established procedures or guidelines within strict limits. *See* 29 C.F.R. §§ 541.202(a); 541.202(e) (to meet the exemption requires more than the use of skill in applying well-established techniques, procedures, or specific standards described in manuals or other sources).

For example, inspection work seldom meets the exemption because inspectors normally perform "specialized work along standardized lines involving well-established techniques and procedures[,] rely on techniques and skills acquired through special training or experience[, and] have some leeway in the performance of their work but only within closely prescribed limits." *Id.* § 541.203(g); *see also* § 541.704 (no exemption for employees who apply well-established techniques or procedures within closely prescribed limits to determine the correct response to an inquiry or set of circumstances).

It was this inspector example that the Fifth Circuit found closely mirrored utilization review work and compelled finding the administrative exemption inapplicable. *See Clark v. Centene Co. of Texas*, 656 F. App'x 688, 692 (5th Cir. 2016). Similarly considering the utilization work performed here, NMMs at Anthem use well-established materials to complete their work, rely on skills acquired through training on the job, and operate within a governing program built to ensure the worker makes the correct response to an authorization request. NMMs are expected to strictly follow Anthem's policies and

procedures when finding and applying the proper medical necessity guideline. Any leeway exists only within Anthem's closely prescribed requirements.

Anthem authorizes NMMs to take two possible courses in response to an authorization request and dictates what compels each. If the applicable guideline is met, the NMM must approve the request. If not, the NMM must recommend denial and escalate the decision to an Anthem Medical Director for final review. The NMM may request additional records from the provider, but only as needed for the NMM to decide whether to approve or recommend denial. NMMs do not evaluate possible courses of conduct. Their only options are to approve or recommend denial, based on the applicable medical necessity guideline and inspection of the medical records.

While reviewing authorization requests requires skill, the record does not support a finding that the level of skill rises above applying well-established guidelines to a set of medical records within closely prescribed limits. Therefore, the administrative exemption fails for this reason as well.

### 2.      Learned Professional Exemption

Turning to the learned professional exemption, three elements must be met to qualify: (1) the employee's primary duty must be performing work that requires advanced knowledge; (2) the advanced knowledge must be in a field of science or learning; and (3) the advanced knowledge must be customarily acquired by a prolonged course of specialized intellectual instruction. *See* 29 C.F.R. § 541.301(a). RNs are generally considered learned professionals, while LPNs and other similar health care employees generally are not. *See id.* § 541.301(e)(2). As above, the primary duty under consideration

is utilization review work performed by NMMs at Anthem in Minnesota.

### a. Work requiring advanced knowledge

The advanced knowledge question is whether NMMs' work involves the consistent exercise of discretion and judgment versus routine mental work. *See* 29 C.F.R. § 541.301(b). Based on the record here, NMMs' utilization review work at Anthem mostly involves routine mental work, not consistent discretion and judgment. Anthem's program structures, processes, training, and especially its performance evaluation that requires NMMs to choose the correct case outcome at least 90% of the time eliminate variability by design, which minimizes discretion and judgment.

### i. Proper judgment and discretion analysis considers the nature of the work itself, and not in comparison to the arguable learned profession at issue

The parties fundamentally disagree about the proper approach to analyzing discretion and judgment. Neither side points to binding caselaw from the Eighth Circuit that controls the analysis. Instead, Learing points to *Rego v. Liberty Mut. Managed Care, LLC*, 367 F. Supp. 3d 849 (E.D. Wis. 2019) and *Clark v. Centene Co. of Texas, L.P.*, 44 F. Supp. 3d 674 (W.D. Tex. 2014), *aff'd*, 656 F. App'x 688 (5th Cir. 2016) as instructive, while Anthem contends that the two-step inquiry developed by the Second Circuit in *Pippins v. KPMG, LLP*, 759 F.3d 235, 251 (2d Cir. 2014), applied to utilization review nurses in *Isett v. Aetna Life Ins.*, 947 F.3d 122 (2d Cir. 2020), should control.

*Rego* and *Clark* focus on the nature of the work duties, while the *Isett* approach focuses on the nature of the person doing the work. *Rego* found that, based on the nature of utilization review work as performed, the utilization review nurses relied mostly on

medical necessity guidelines, and not consistent use of their own discretion and judgment, to determine whether an authorization request should be granted. *See* 367 F. Supp. 3d at 857–58. The work therefore did not satisfy the advanced knowledge requirement. *See id.* at 859–60.

Anthem argues that *Rego* should be summarily rejected here, as it was in *Isett.* In *Isett*, the Second Circuit critiqued *Rego*'s advanced knowledge analysis because it "did not account for the unique character of the learned professional exemption" and failed to apply the two-step test from *Pippins. See* 947 F.3d at 135, 138 n.77. *Rego*'s reasoning is not so flawed. Rather than apply an out-of-circuit test (which the Second Circuit developed in a case involving accountants and had not yet applied to utilization management), *Rego* took a different approach. It repurposed the analysis of the more rigorous "judgment and independent discretion" required for the administrative exemption to consider the less rigorous "judgment and discretion" required for the learned professional exemption (citing Seventh Circuit authority allowing it to do so). *See* 367 F. Supp. 3d at 859.

*Isett* further criticized *Rego* for relying on *Clark* because that case did not analyze the advanced knowledge element of the learned professional exemption. *See Isett*, 947 F.3d at 135 n.59. But *Rego* simply agreed with *Clark*'s characterization of utilization review work as "inspector-type work" and then independently found that the utilization review work at issue is best described as routine mental work. *See* 367 F. Supp. 3d at 860. *Rego* offers a useful and persuasive approach to evaluating the characteristics of utilization review work outside the Second Circuit.

*Clark* is distinct from this case, however. Anthem expressly disclaims the use of nursing judgment from the primary duties for its utilization review jobs that require LPN licensure. (*Compare* Doc. No. 131-50 *with* Doc. No. 131-49.) In *Clark*, the learned professional exemption did not apply because the employer did not distinguish between LPN-level and RN-level utilization review positions. *See generally* 44 F. Supp. 3d at 676–81. *Clark*'s approach to the exemption analysis and assessment of the utilization review work and industry is informative, but as its facts are materially distinct, *Clark* will not dictate the outcome on advanced knowledge.

Anthem's preferred authority, *Isett* from the Second Circuit, will not dictate the outcome either. A key factual difference in *Isett* is that the RN-level "nurse consultants" held final review authority over approval recommendations made by LPN-level "nurse associates" who had no authority to approve a case. *See* 947 F.3d at 126–27. By contrast, RNs, and LPNs at Anthem hold the same level of authority. That distinction aside, *Isett*'s two-step test will not be applied here because it overcomplicates and colors the exemption analysis based on a characteristic of the worker rather than the work itself. *Isett* wrote that an exclusive focus on work duties misinterprets the analytical framework established in *Pippins*. *See* 947 F.3d at 132. *Pippins* does not control here, and closely examining work duties as actually performed is the proper FLSA exemption analysis.

### ii. Utilization review nurses and patient care nurses review medical necessity for distinct purposes

*Isett*'s test is also a poor fit because the parties fundamentally disagree over whether NMMs work in the field of nursing (but in a nontraditional setting) or in the field

of insurance. Even without resolving the debate, a brief comparison of RNs working in a patient care setting and NMMs conducting utilization review reveals a meaningful distinction in the nature of their work that the *Issett* test might fail to appreciate.

Patient care RNs review records and assess a patient's condition for purposes of deciding the course of treatment. The NMMs' primary task is to make an insurance coverage determination based on an inspector-clipboard checklist appraisal of medical records for the presence or absence of medical necessity criteria. *See Rego*, 367 F. Supp. 3d at 851, 858 (distinguishing utilization review nurse role from a registered nurse in practice); *Clark*, 44 F. Supp. 3d at 676 (describing the utilization management role in the insurance process). NMMs do not coordinate patient care directly or remotely. An NMM's review affects only how a treatment is paid for, not whether the treatment will be provided.

RNs in patient care settings and NMMs at Anthem both review medical necessity and even use some of the same resources to do so. But patient care RNs review medical necessity by assessing patient needs for a possible course of treatment. NMMs review medical necessity by inspecting medical records to decide insurance coverage. That distinction differentiates work that requires consistent use of judgment and discretion from routine mental work. Based on how NMMs perform utilization review within Anthem's program, the record reflects that NMMs do not consistently use judgment or discretion, nursing-like or otherwise, to qualify as learned professionals.

### iii.   Anthem's utilization review program is designed to limit variability and avoid incorrect medical necessity determinations

According to *Isett*, it is "a hallmark of informed professional judgment to understand when a problem can be dealt with by the professional herself . . . and when the issue needs to be brought to the attention of a senior colleague (i.e., a medical director) with greater experience, wisdom, or authority." 947 F.3d at 134–35. No such judgment is available to NMMs here. Based on how Anthem trains and evaluates NMMs' performance, it views their medical necessity determinations as true or false propositions—not judgment calls—and operates a system in which NMMs have *no choice* other than to approve or recommend denial, depending on what is seen in the records. NMMs at Anthem lack the professional discretion to assess whether they can handle a request themselves or if it should be elevated to the next level of authority. Anthem's policies control, dictating when an NMM may or may not elevate a request.

Anthem argues NMMs nonetheless exercise sufficient judgment and discretion, depending on the complexity of the authorization request, the nature of the applicable guideline, and whether an NMM believes there is a basis to approve the request despite not satisfying the applicable medical necessity criteria. Anthem further contends that particular guidelines might require subjective interpretation, and that some NMMs even advocate for a Medical Director to approve a request that the NMM had to deny.

The record does not support a finding that NMMs consistently exercise such discretion and judgment. Discussions with a Medical Director where an NMM advocates to approve a request despite recommending denial are the exception, not the rule. In fact,

NMMs handling outpatient requests do not discuss denial recommendations with Medical Directors at all. NMMs are mainly tasked with sifting through medical records to identify whether specific criteria are present; the record does not show them to be consistently analyzing, interpreting, or deducing from the records whether a guideline is satisfied. Anthem's NMMs have limited discretion and exercise judgment infrequently at most. Their work is mostly routine and does not involve consistent discretion and judgment sufficient to meet the regulation's definition of work requiring advanced knowledge.

Finally, Anthem correctly points out that using manuals, guidelines, or established procedures does not necessarily preclude exemption. *See* 29 C.F.R. § 541.704. But no exemption (learned professional, administrative, or otherwise) is available for employees who apply well-established techniques or procedures described in manuals or other sources within closely prescribed limits to determine the correct response to an inquiry or set of circumstances. *See id.* The record shows that NMMs working in Anthem's utilization review program fit that description. NMMs read and consider the applicable medical necessity criteria on their own, but they do so according to Anthem's policies and procedures, using Anthem's systems, and subject to routine examinations evaluating whether they correctly decide cases at an acceptable rate. Other than reading a guideline and looking at a medical file, Anthem closely prescribes nearly every other aspect of the utilization review process. NMMs use clinical guidelines within the closely proscribed confines of Anthem's utilization review program to determine the correct response to an authorization request. Under § 541.704, that work does not qualify as exempt.

### iv.      Conclusion on advanced knowledge

The record supports a finding that utilization review work conducted by NMMs within Anthem's program is routine mental work, and does not support a finding that their work requires consistent discretion and judgment. Accordingly, Anthem cannot establish the advanced knowledge requirement for the learned professional exemption to apply. Thus, summary judgment is granted for Learing on that basis.

### b.      Customarily acquired by a prolonged course of specialized intellectual instruction

Because the learned professional exemption fails on advanced knowledge, there is no need to consider specialized intellectual instruction. Even so, it is not immediately clear that the specialized intellectual instruction element would be satisfied here.

The specialized intellectual instruction element examines the standard prerequisite to enter the profession. *See* 29 C.F.R. § 541.301(d). The best evidence that a worker meets the requirement is possessing the appropriate academic degree. *See id.*

NCQA establishes LPN-level credentials as the minimum required to perform utilization review work. Utilization management is not taught in nursing school. And Anthem previously staffed LPNs and RNs on the same utilization review teams but now distinguishes between the roles. Based on that evidence, RN-level academic training does not appear to be the standard prerequisite to join the utilization review industry. *See, e.g.*, *Rego*, 367 F. Supp. 3d at 862 (finding that standard prerequisite for utilization review work is LPN-level credentials, despite employer requiring its utilization reviewers to be RNs). Anthem requires RN licensure for utilization review work that it deems more

complex or difficult. But that is Anthem's choice, not an accreditation requirement. Anthem's business practice does not equate to an industry standard for entering the field.

### B.    Analysis of Anthem's Section 260 Good Faith Defense

Learing also seeks summary judgment on any good faith defense to liquidated damages that Anthem may assert, arguing that Anthem has not produced sufficient evidence of its decision to classify the NMM positions as exempt.

An employer who violates the FLSA is liable for unpaid wages plus an equal amount of liquidated damages. *See* 29 U.S.C. § 216(b). Courts may reduce or deny liquidated damages if the employer shows its actions were taken in good faith and that it had reasonable grounds to believe its actions would not violate the FLSA. *See* 29 U.S.C. § 260. The burden of proof is difficult, requiring the employer to establish its honest intention and affirmative steps to learn and follow the FLSA's requirements. *Chao v. Barbeque Ventures, LLC*, 547 F.3d 938, 941–42 (8th Cir. 2008).

Anthem explains that the administrative and learned professional exemptions, including the regulation recognizing that RNs generally qualify as learned professionals, have been long established. Anthem does not otherwise show what steps it took to determine FLSA requirements for the NMM positions or point to evidence showing the company had reasonable grounds to believe that classifying NMMs as exempt did not violate the FLSA. In fact, FLSA lawsuits against Anthem's predecessor dating to 2008 indicate that Anthem has been on notice of its potentially unlawful classification of utilization review nurse positions. *See Lazaar v. Anthem Cos.*, No. 22-cv-3075(JGK), 2023 WL 405016, *3 (S.D.N.Y. Jan. 25, 2023) (finding that allegations of prior

misclassification lawsuits against Anthem predecessor sufficient to raise question of willful FLSA violation for purposes of determining applicable statute of limitations); *see, e.g.*, *Ruggles v. WellPoint, Inc.*, 253 F.R.D. 61, 63–64 (N.D.N.Y. 2008). The existence of applicable regulations and the fact that Anthem's NMMs are salaried positions do not show Anthem's intent or classification process.

The purpose of summary judgment is to dispose of factually unsupported claims and defenses. *See Schmidt*, 967 F.2d at 272; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). Anthem has not identified evidence that would support a verdict in its favor on a good faith defense to liquidated damages. Summary judgment is therefore granted for Learing on Anthem's good faith defense.

## ORDER

For these reasons, and based on all the records, files, and proceedings here,

**IT IS HEREBY ORDERED** that:

1.      Plaintiff's Motion for Partial Summary Judgment (Doc. No. 126) is **GRANTED**.

2.      Defendants' Motion for Summary Judgment (Doc. No. 139) is **DENIED**.

3.      Defendants' Motion to Decertify Conditionally Certified Collective (Doc. No. 133) is **DENIED**.

4.      Plaintiff's Motion to Certify Class (Doc. No. 145) is **GRANTED** as follows:

a.      The following Rule 23 class is certified:

All persons who worked as Medical Management Nurses, Utilization

31

Management Nurses, Utilization Review Nurses, or other similar job titles who were paid a salary and treated as exempt from overtime laws, and were primarily responsible for performing medical necessity reviews for Defendants in Minnesota from three years prior to the filing of this Complaint through judgment.

b.      Plaintiff must file an amended proposed class notice reflecting the rulings made in this Order within 14 days, after which an order setting a 45-day notice period and authorizing Plaintiff's counsel to mail the class notice will be issued. If the notice will be sent to individuals who already received notice of the FLSA action, the amended notice should explain why they are receiving a second notice and explain the opt-out procedure that applies to the state law claims. Defendants will be permitted to raise its objections to the amended notice by filing a letter with the court within 7 days of Plaintiff's filing the amended notice.

c.      Plaintiff Christine Learing is appointed Class Representative.

d.      Nichols Kaster, PLLP is appointed Class Counsel.

e.      Defendants are ordered to produce a list of all individuals who worked in a medical management nurse role in Minnesota or otherwise fit the certified class description at any time in the three years prior to the filing of the Complaint in this matter.

Date: March 22, 2024            *s/ Jerry W. Blackwell*
                                JERRY W. BLACKWELL
                                United States District Judge